Good morning, everyone. Please be seated. You're on the second page of the documents. Forms 2-25-0146. People of the State of Illinois, Mrs. Jacqueline B. Richard P. Rowland, and Ms. Helen. Arguing on behalf of Ms. Helen, Ms. Jacqueline S. Jacobson. Arguing on behalf of Ms. Jacqueline, Ms. Karen McConaughey. All right, counsel, Ms. Jacobson, you may begin when ready. Please feel free to adjust the microphone. Adjusted it. I'm very short. Good morning. Good morning. May it please the court, counsel. My name is Jacqueline Jacobson, and I represent Mr. Rowland. Mr. Rowland was in a fight for his life, but this was not a fair fight. His hands were tied behind his back. He was convicted on testimony that was so contrary to human experience and nature that it was unworthy of belief. He was not allowed to present suspiciously similar false accusations against him to the jury, and he was effectively barred from presenting alternative reasons for the accuser's behavior. He was not allowed to contextualize statements he made to a detective, and all the while, the accuser's testimony was bolstered by improperly admitted expert evidence, and there was an unconstitutional and harmful interruption into the jury deliberations. Would you agree that almost all child sexual assaults and abuse takes place in private between the abuser and the victim? I don't know the statistics, but I understand that that's possible. You also understand that the reasons for extended limitations in child sexual abuse cases, and that's because they go uncovered for years before disclosure, right? I do, but I think that respectfully that this case was different in that the allegations of abuse, the assaults occurred in a home while there was always somebody present, and the allegations were of daily abuse by a grown man on a young girl, and the allegations occurred daily, nightly, so much so that there was crying out, so much so that the defendant allegedly told her to be quiet, so much so that there was blood dripping on the floor that this child had to clean up, so much so that she alleged she had bruising and injuries, and yet no one in the house saw or heard anything suspicious. This was a house where you could hear the water running from the bathroom. You could hear downstairs, and these assaults were not... They didn't occur over a few minutes. This is not something that occurred over a few minutes. These were allegedly lengthy assaults. I believe one of the assaults was the length of two SpongeBob episodes, so that was an hour and ten minutes or an hour and five minutes. So essentially you're asking us to re-weigh the evidence. We're not asking you to re-weigh the evidence. We're asking you on the line of cases not to rubber-stamp the trial court and the jury deliberations because the difference with this case is that the testimony was so contrary to human nature and experience. It's a different line of cases, and we're not asking you to re-weigh it. Like which case? Shot, maybe? Shot is a case... Shot is if the victim testified and admitted that she had lied. And in this case, we do have false accusations. What are they? There were false accusations relating to a birthday party or a pool party in Belvidere, Illinois. She had the date wrong. She didn't have the date wrong. Did she admit that she lied about the acts itself? She walked her story back. And the reason she changed the date... Did she admit that she lied about that? She did not admit she lied. And that was the case that you tried to present to show that all the other allegations were false? That was the case that we tried to present to attack her credibility and her motive and bias and the reason that she lied. She had a pattern. The part of the defense was that she was a pack. She had a pattern of taking actual events and then sort of changing them and including these sexual assaults out of spite against the defendant. And the reason the pool party isn't just a matter of changing a date is because in no uncertain terms she said that sexual assault occurred while she was changing out of her wet bathing suit. She knew the color of the bathing suit. I think the top was black, the bottom was white. She went to the bathroom to change out of the wet bathing suit. The problem is, is that on the day she alleged that it happened, there was no swimming that day. So she walked it back. And she said, well, it was in July when it would be warm enough to swim. But again, the only time, the only time, and we had witnesses to show this, the only time that she was present at that home the same time as Mr. Rowland was the pool party, was the party at the Belvedere home where there was no swimming that day. So there was a party at the Belvedere home in September. Is that what you're saying? There was a party, a birthday party. And she, so, her argument is that she's a liar, that there's no way she wore a bathing suit that day, but she was there and he was there. She was there and he was there. And that he used the bathroom. And then he gave the statement to the police that he masturbated in the bathroom to explain why his semen might be found there. He did give that statement to the police, but that was not before the court. It was not before the jury. No, but that's what would have come out had he been allowed to go into that. Well, it didn't come out in Boone County where the statement was, and the judge kept it out here. And initially, the state tried to get those Boone County allegations in because they felt that they were a propensity, and they felt that they were relevant. And then when the defense tried to get them in, then there was a rape shield statute filed to keep them out. And later on, and this is another issue, is when the detective was allowed to impeach him for a statement that he said he didn't recall. He never said he never said the statement. He said, I don't remember saying it. That related, that sort of challenge, like if you think I did it, you have to prove me wrong. The state was allowed to get that out. It led the jury to believe that he was just making this sort of arrogant challenge out of the blue. But actually, that related, that statement related to the Belvedere House Party, and he wasn't allowed to get that in. And that's why we asked to be able to put that in context by adding in a couple statements that, to show his frustration with the police telling him he had done all these horrible things and not believing him. So the unusual thing about this case is everything is sort of interconnected. And you have this testimony that is so contrary to the laws of human nature that reasonable doubt exists. And then at the same time, you have a trial judge that tied defense counsel's hands behind their back and didn't allow them to bring in these false accusations. And they fit within the paradigm of the Howard and Cookson case. These were false allegations by the same individual against the same defendant and suspiciously similar activity. And they were not allowed in. They're collateral, right? They're not collateral. Why not? Because under Howard and Cookson, they're the same individual making the same kind of statements against the same defendant. This is different than somebody else saying, in the past, this woman had, or the accuser had sex, accused three other men of having sex with her and it wasn't consensual. This is different. These are different cases. And we don't, they're not collateral. States certainly didn't think they were collateral when they tried to get the men initially under rape shield. What did the victim have to gain or lose from her testimony and from coming forward? Well, there was evidence. What was her motive? She hated Mr. Rowland. She hated him. She didn't like living with him. She didn't like him parenting her. She didn't like that she was a defiant. There was evidence in the record that she fought with her family a lot, and she did not like that she didn't like living there. She didn't like going back there. She didn't like being around him, right? Well, that could have been related to either side, that she didn't like him. There was testimony that before they moved in with the defendant and the defendant's wife, she was a happy-go-lucky kid. We don't, well, that leads me to another problem. The problem is we asked for an in-camera review of the mental health treatment records, and we weren't able to get them. And in your brief, you suggest that there might be information in those records. Isn't that a phishing expedition? That's a classic phishing expedition, isn't it? It is not a classic phishing expedition, and I'll tell you why. Because in this case, the state sought to get in the child sex abuse accommodation syndrome evidence, and they explicitly tied certain behaviors to her behaviors, and they did it to explain to the jury, and I understand that this evidence comes in. We conceded that. But there's supposed to be, before that kind of evidence comes in, there's supposed to be a determination as to whether you attack the credibility of the victim. This is an important guardrail under Dempsey, and the trial judge ignored that guardrail here. She recognized it. The trial judge said, well, I'm not going to do this in-camera review because isn't it true that none of this evidence comes in unless you challenge the credibility? And then lo and behold, no in-camera review is done, and the credibility is not challenged, not beyond cross-examination, and that guardrail means nothing if it's just cross-examination. Let me ask you this. Sure. Going back to the completeness doctrine, does the completeness doctrine give the defendant the right to have a prior consistent statement admitted when he testifies that he never did any of the conduct that he's accused of? The idea behind the completeness doctrine, and I'm sure you know, is to be able to sort of contextualize a statement so that the jury isn't misled. The statement, if you take the recording, and I think the completeness doctrine refers to recordings, written statements, but it's the same document at the same time. So his testimony is not the same thing as him saying to the police detective, I didn't do this, you guys got the wrong guy, this isn't it. And then his frustration when they're attacking him, and he says, fine, if you think I did it, then you have to prove it. But when it comes out the way it did in the last sort of minutes of the trial, it looks like an out-of-the-blue attack on the system, and that left them with a bet. And the other impression it left the jury with was that he was a liar because they were allowed to impeach him on a statement that he didn't, he said he didn't remember it. So the contextualizing that statement became very important in this case. Counsel, I'm not quite sure I understand what the law is relative to the fact that he doesn't remember making an incriminating statement. It's my understanding that the jury is entitled to hear that he doesn't remember it, but I don't know that that necessarily means that, as you imply, that the jury can't assess the credibility of the scenario and make finding the fact and conclusions of law. So could you clarify for my mental purposes what exactly it is that you're claiming is error? Well, what we're claiming is error was the completeness doctrine, that he wasn't allowed to contextualize the statement that came in. The lead-up to that is what makes it critical that he was allowed to do that. The lead-up to that was when he was on the stand and the state asked him if he remembered making the statement. The gist of it was, you know, you're going to have to prove it. It doesn't matter whether I did it or not. You're going to have to prove it. Do your best. He said, we asked him twice, do you remember making that statement? He said, I don't remember. I don't remember. The trial judge allowed the state to perfect impeachment by calling the detective back and playing a 12-second clip from his entire interview. And the only part of the clip was this sort of arrogant, brash statement that was completely taken out of context. At that point in the trial, the defense counsel argued that that denial or that statement, the frustration he was talking about, was actually with respect to the Belvedere County allegations, which, as we know, were not allowed to come in. So there was a sort of added layer. The argument, though, is under the – so the judge says, no, this is coming in. And then the trial counsel says, well, then I'm going to try. I want to get these two statements in to clarify it so the jury doesn't think that this is just some out-of-the-blue statement. And the trial judge denied the objection. So that is the – the core of the argument is under the completeness doctrine. I'm having a problem with your assigning the error to the file or the folder of completeness as opposed to, as you say, out of context. To me, completeness doesn't necessarily relate to the misapplication of a statement, so to speak. Normally, completeness suggests you're talking about a particular day, particular time, particular place, and somebody says something. Well, then the completeness doctrine says you should be allowed to present evidence relating to that factual scenario. That doesn't seem to be what you're arguing here. What you seem to be arguing here is, is that in response to or reply to an issue related to some other transaction that the state took a statement – it reminds me of my cousin Vinnie – where you're arguing completeness doctrine when it's the context, which is we killed him or we drove over him or whatever. The point is it was a question or an exclamatory statement made of incredulity in my cousin Vinnie, which isn't necessarily completeness. It's the idea that you're supposedly taking it out of context, so to speak. So I'm having some problem accepting your argument that the completeness doctrine, as opposed to possibly the fairness doctrine, that says that, no, you're applying a quote or a comment to a factual scenario that isn't even close to what we're talking about here. You see the difference between completeness and the parallel application? I do. May I – I see my time's up. May I just respond? Sure. You have no problem. Sure. Well, initially, defense counsel objected, much like you're saying, because he said this statement wasn't regarding the allegations in this case. It was regarding the allegations in Belvedere, which you didn't let in. And then the argument then morphed into, and which we presented on appeal, was that the jury was being misled by this 12-second statement. And so that's what we look at as the completeness doctrine, and the case law talks about the jury being misled. And we – the jury was misled. They were misled in two ways. One, that this was about Boone County when it was about Belvedere, which – and two, that he was challenging the detective. He wasn't. And he should have been able to get in his level of frustration, because the jury was misled into believing that he was just arrogant and brash and doing all this. And they were left with that impression. Any further? I just have one quick question. With regard to the jury communication, the defendant did not object at trial or during the polling of the jury, correct? He agreed with the procedure adopted by the trial court. The defendant did object at trial. He objected after the fact, because it was a strange sequence. When that opportunity was there to object, he did not? He did not. The polling was not directed towards that particular issue, but the issue of the jury deliberations was extensively argued in the post-trial process. But not at the time? He objected. I understand he objected when he could, but we also suggest that, in this case, Kleiner should have been applied to relax the forfeiture rule. Thank you. Thank you. All right, thank you, counsel. You will have time in rebuttal. Ms. Connelly, you may begin when ready. Please feel free to adjust the microphone as needed. May I please support, counsel? My name is Claire Russell Connelly. I am a staff attorney with the Illinois State's Attorney Prosecutor's Office, and I represent the people of the state of Illinois in this case. Now, there are several evidentiary issues that the defendant raises today, in addition to challenging the sufficiency of the evidence. What I'd like to focus on today is the sufficiency of the evidence, as well as the substantive merit. I've raised several claims relating to preservation of issues and harmless error, but I'd like to focus on the substantive merit of each of those, unless Your Honor is having questions. We're here today because the victim, who was a young child, while she lived with her, with the defendant, and her step-grandfather was repeatedly sexually assaulted by that man when they shared that house together. He used those sexual assaults to punish her, as an excuse, to punish her for her alleged misbehavior. Counsel, I thought that sexual gratification was supposed to be the element that was supposed to be proven, not the idea that you use sexual incidents or sexual torture to punish people. Correct, but there's evidence that was introduced at trial to explain the statements that he made to her, leading up to why he was doing this to her. That's why I speak of those. What were the instructions? What were the instructions taught in terms of sexual gratification? It was predatory criminal sexual assaults. I don't recall the specific instructions that were given in this case. It's related to something other than necessarily inserting or touching the organs of him and her? I recall that that was her testimony, and that was the focus in this case is the penetration that occurred repeatedly between his fingers and his penis and her vagina. Those were the counts in the predatory criminal sexual assault in this case. And the defense of the defendant was that this was due to a form of corporal punishment that seems to be rather esoteric? I'm talking about the fact that he used this as a form of punishment to explain what happened in this case and why the victim felt tortured in this case and why she did not speak out. The kind of mental manipulation that the defendant engaged in with this young child, that's why I'm talking about that evidence in this case. The defendant also told her that if she told anybody about this, he threatened to kick her and her family out of this house and leave them stranded on the street. She was a young child when this happened, and she had the courage to speak up about this when her younger sister reached the same age as she did, and she was concerned that her younger sister would suffer the same fate at the hands of the defendant in this case. The trial court in this case, while the trial court was not the trial of fact in this case, when evaluating the evidence found that the evidence was overwhelming. That's how the trial court found this evidence in this case. She vividly recalled the three incidents in which he sexually penetrated her. He was in a downstairs bathroom the first time. The second time was in the upstairs bathroom. The third time was in the basement while she was watching innocently a SpongeBob movie. Her testimony was about those isolated occurrences, but she did testify, and she made a statement, too, in her victim-sensitive interview that it happened every day. Right, right. But it actually didn't happen every day. Well, the state didn't charge him with doing it every day. Right, so he got charged with three counts. Three counts, so that's all the jury had to believe. The jury didn't have to believe that it happened every day. It's not unlike other cases involving ritualistic sexual abuse of child. You've had sexual assault cases that you've seen. I've handled them. This is not unusual for victims to testify to more incidents than was actually charged in the indictment in this case. They went with three separate incidents. What about the defense argument that the number and severity of the incidents in a house in which the walls are thin and there are people around undermines credibility? Do you have to respond to that argument? That was up for the jury to decide in this case. Well, if that was the case, then the defense claims that they should have been able to present evidence of the falsehood of certain other allegations. Okay, so there's two different cases that he wanted to present. One was the Boone County case. That case is still pending in front of Boone County. I checked. I called. It's still pending. There's a date in May that it's set for. The other case has to do with what they refer to as the Vander West case. That was never charged. In that incident, that's a pending case. So what the defendant wanted to do was he wanted to try that case in McHenry County. And there was never, you look at the cases in which you talk about these other false allegations as an exception to the rape shield statute. In those types of incidents, those are ones in which, for instance, the victim recanted. We don't have a recantation in this case. There was one case in which the mother had threatened to get the defendant at one point. We don't have any threats by any of the family members to get to retaliate against the defendant in this case. And there was also another one in which there was testimony in which the, defeated the suggestion that the victim and the defendant were together at any point. In this case, we have the defendant admitting that he was with the victim in this other incident. So when the defendant wanted to introduce all of these other, I should say, this other incident in Boone County and the other claim, he had the burden to establish the falsity of that claim. He was unable to do that. He wanted to test the falsity of a pending case before the trial of fact in McHenry County for a case that had not been resolved. A trial of fact in McHenry, in Boone County, had never had the opportunity to determine the guilt of the defendant in that case. That is why he can't establish the falsity of this claim. When one of your honors mentioned it was collateral, all of this other evidence had to do with details. That's all collateral evidence. That doesn't establish that the claim never happened. He was, the trial court did not abuse its discretion in this case in making the decision to keep that evidence out. The defendant argues in his brief that Katie did not disclose to her father, to her mother, or to anyone else, and that that is evidence that the sexual assaults did not happen. I believe there's also evidence to show that the reason why young sex assault victims do not cry out to their parents is because of the concern that there may be some type of upheaval. Who she chose to outcry to in this case was her therapist. It was some other trusted individual. She trusted that person to help her. And she was worried about her little sister. And she was worried about her little sister at the time. She explained why she did it when she did. The counsel also talks about the evidence that was introduced regarding the child sex abuse accommodation syndrome. I'm just going to refer to it as a syndrome so that it's easier to say. Let me ask this. Oh, sure. Was there any evidence presented regarding Katie's reputation for truthfulness? No. No, not that I recall at all. So there was no indication that she had been a liar in the past? Correct. Correct. As far as the syndrome evidence that was introduced, once the defendant attacks the victim's credibility, and that was honestly done repeatedly in this case, the states permitted to introduce an expert regarding this syndrome. So the trial court's decision on the admissibility of that evidence was not abuse of discretion in this case. And I look at that, what the evidence that was subsequently introduced, that relates to the defendant's request for the subpoena for the mental health records. The defendant wanted to tie that subpoena to show this syndrome, to see if there was anything in these mental health records to show that she had said something that would dispute that testimony. But when you look at what the testimony is of that expert in this case, she said that this syndrome is not a diagnosis that is used by mental health experts in treating patients. It is a way that clinical professionals discuss how a child who has undergone sexual violence will react. It is used exclusively in court to explain evidence of recantation, delayed reporting, inconsistencies, when a victim's credibility has been attacked. So when the defendant wanted to get the victim's mental health records in this case, because he thought there might be something in those records to dispute this syndrome, that there may have been a diagnosis, there would never be a diagnosis in those records, because that's not what the therapist would have looked at. This syndrome is exclusively at trial. It's not done by a therapist who's treating that child. So his request... Are you arguing that the inebriated individual is looking under a streetlight for his car keys because the light was so much better? If I understood your question, I would be able to answer it, but I honestly don't understand. I think what you're saying is that like the inebriated driver who thinks that the improved lighting will assist him in gleaning the evidence, when the evidence isn't there, and in the situation that we're discussing here, that he is looking in a place for things that you won't find there. Correct. I would agree with that analogy, absolutely. I thought you were talking about the drunkard using the lamppost for support instead of illumination. No, it was because the light was so much better. Thank you for explaining the point that you were trying to make. Exactly. There was never going to be that evidence. This constituted a mere phishing expedition on the part of the defendant. Did this testimony of the expert open the door in any way? Their claim is that it improperly bolstered her credibility, and so shouldn't they have been allowed to attack the credibility by exploring other diagnoses? No, it's not improper. All that happens in order to get this evidence in, this syndrome, is the defendant attacks her credibility. Once he does that, it's in, and they did that repeatedly in this case. They attacked the victim's credibility through her own testimony, through the testimony of the mother, and through the testimony of the father in this case. So that is clearly admissible evidence. So while those two issues are interconnected, I use that evidence regarding the admissibility of this syndrome in this case to explain why the victim's mental health records, that the subpoena should not have been issued in this case by the trial court, and the trial court did not abuse its discretion. Regarding the defendant's issue with the completeness factor in this case, I would say, I think what needs to be first addressed is what the actual statement was. Counsel didn't really go into that. The statement is, it doesn't matter if he says he did it or not. If I can prove it, if I can prove he did it, prove that he did it, do my best. So that was a statement of the defendant challenging the detective to prove him, prove the evidence in this case. Not the evidence in the Belvedere case, you mean? It was not the evidence in the Belvedere case, and that's exactly what the trial court found. The trial court said no, and the state argued no. This had nothing to do with the Belvedere case. This was all the allegations, all the allegations in this case. It was not exclusively related to the Belvedere case. You can finish that, though. What he wanted to deduce is the statement, he doesn't think he should be arrested or go to prison, he didn't do anything. All of that amounts to is a denial and the improper introduction of evidence for the jury to consider as to the possible prison sentence in this case. And his opinion as to whether or not he should have been arrested in this case. That does not fall under the grounds of a completeness doctrine in this case. It merely constitutes his ability to express his own opinion about his arrest and his possible punishment. That should not have been admitted under the completeness doctrine in this case. Thank you, counsel. Thank you, Ms. Jacobson, your rebuttal. Can I make a few points about the mental health records, not being a fishing expedition? Nobody looked at the evidence. What we did under the Mental Health and Disabilities Confidentiality Act is the PAC, is that we understand that there is the confidentiality of mental health records. And all we asked was that the judge at least review them in camera to determine whether the child sex abuse accommodation syndrome comes in, whether there's something in there that we could then attack the credibility. It's not a diagnosis. We weren't looking for a separate diagnosis. What we're looking for and what the state put. You're looking at the content. We're looking at the content and what the state, why the state opened the door is because there were allegations that she cut herself, that the accuser engaged in cutting. And that evidence was given to the expert on child sex abuse accommodation syndrome, because that is one of the behaviors that could be associated with the syndrome. We were looking for these behaviors and whether there was a different explanation for them. But the jury was left with the unrebutted presumption that the only reason for some of these behaviors was because she was sexually assaulted. So the credibility of the witness was not really attacked. The cross-examination, then there is no important guardrail. The guardrail is a nullity if it's just cross-examination that gets this in. And I want to go back briefly to the false statements. The only way a defendant can rebut a sympathetic witness alleging an unspeakable, secretly committed crime is with, well, it's not the only way. There's two ways. It's with if the evidence defies human experience. We talked about that on the sufficiency. Or if we can show that there was a bias or a motive to lie. And in the Howard case, which is nearly identical, it's a Third Circuit case, the trial judge, when they talk about these kind of cases where there are no eyewitnesses, no earwitnesses, and no physical evidence, which is often common in these kind of cases. In those kind of cases, the trial judge should give the defendant wide latitude to probe the witness's bias and prejudice or motive to testify. And the trial judge did not do that in this case. There was no wide latitude. These provably false accusations were not a mini-trial. They weren't tested. When you say provably false again, you're saying it, and you called all these witnesses. All these witnesses were called. They didn't see. They didn't hear. Witnesses who testified, they didn't see. They didn't hear. They were not aware of any of these episodes, right? It was actually the government's witnesses who did not actually, there was no witness. Richard Roland's wife, Julie, testified that she didn't hear anything. But it was actually the government's witnesses that testified that they didn't hear anything. It was Eric, the stepson, who is a firefighter and a mandated reporter. And there was a, we did have a defense, no. There was a gymnastics coach who, the victim spent 12 to 16, the accused spent 12 to 16 hours a week doing gymnastics with. She was a mandated reporter, and she didn't see or hear or notice anything suspicious. But we weren't allowed to show that this accuser made similarly false accusations against the same defendant. And those accusations, we provided a prove-up to show that we would have 23 witnesses to say that there was no swimming on that day, and that was the only day they were together. So if there's no wet bathing suit, there's no sexual assault. And there was no other day that could have happened. And similarly, with the Vanderwest allegation, she alleged that Richard Roland punished her by sexually assaulting her in the bathroom of the kitchen of that home for dropping a bottle of iced tea. Well, again, a multitude of witnesses in the process saying she didn't drop that iced tea, her bottle, her brother did, and she wasn't even present when it happened. So it's a pattern, it's a pattern that the jury should have seen because it's the only thing in these kind of cases. We ask that Mr. Roland's conviction be reversed at a minimum, or at a minimum that the case be remanded for a new trial.